UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA :

- v - :

**18 CR 403 (CBA)**

Mohamadoe Lamine Mbacke

Defendant. :
---------------------------------------------------------------X

**DEFENDANT'S REPLY TO THE GOVERNMENT"S OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS**

**DAVID E. PATTON, Esq.**
Federal Defender of New York
Attorney for Defendant
**Mohamadoe Mbacke**

BY: Jan A. Rostal, Esq.
Isaac Wheeler, Esq.

Of Counsel
(718) 330-1207
jan_rostal@fd.org

TO: **Ruchard A. Donaghue, Esq.**
United States Attorney
Eastern District of New York
Attn: **AUSA Jonathan E. Algor, Esq.**

## INTRODUCTION

The Court will recall that the Defendant's Motion to Dismiss contained points for dismissal that broke down into the following requests:

I. Dismissing Counts I and II based on statutory construction and constitutional avoidance law.

II. Dismissing Counts I and II based on Due Process Clause and per *Mendoza-Lopez,* and as directed by statute in 8 U.S.C. 1252(a)(7)(a).

III. Dismissing Counts I and II based on the Double Jeopardy Clause and/or the Sixth Amendment as instructed in *Frye/Lafler.*

IV. Suppressing all evidence seized as a result of illegal search and seizure on March 27, 2018 based on the Fourth Amendment.

V. Dismissing Count II pursuant to Rule 12(b)(3)(a)(i) of the Federal Rules of Criminal Procedure for improper venue and Rule 12(b)(ii) for preindictment delay, and

VI. For such other and further relief as this Court may deem just and proper.

In responding to the Government's Opposition papers, Government's Opposition to [Defendant's] Motion to Dismiss, ECF 21, filed September 28, 2018 (heretofore "ECF 21"), we will follow the Government's order of discussion.

We will first address the Double Jeopardy/Due Process issues (Point III of the Defendant's Motion to Dismiss), then turn to the more dense immigration law issues (Points I and II of the Defendant's Motion to Dismiss). Points IV and V of the Defendant's Motion to Dismiss are briefly covered at the end.

## ARGUMENTS

**POINT III OF DEFENDANT'S MOTION: *INDICTMENT IN MBACKE II VIOLATES DOUBLE JEOPARDY AND/OR 6th AMENDMENT RIGHT TO COUNSEL/*FRYE/LAFLER**

**A. DOUBLE JEOPARDY – COUNT I**

On the Double Jeopardy motion as to Count I, the Government seeks solace in Blockburger but chooses to ignore Ashe v. Swenson, 397 U.S. 436 (1970), Yeager v. U.S., 557 U.S. 110 (2009), and Evans v. Michigan, 568 U.S. 313 (2013). ECF 21, pp. 8-11. Blockburger, a 1932 decision is, by the Government's own making, a rather blunt instrument to bring to the Mbacke I/II facts. Comparing apples to oranges is not easy under Blockburger. We did it, however, showing the very concentric circles expected, ECF 21, p 7, citing 4 Wayne R. LaFave et al., albeit in table form:

| 18 USC 751(a) as charged in M0BACKE I | 18 CR 403 as charged in MBACKE II |
|---|---|
| 1. on March 27, 2018, within the EDNY<br><br>2. having been ordered removed on 9/16/15 pursuant to exclusion and expulsion proceedings under the immigration laws<br><br>3. did knowingly and intentionally escape from the lawful custody of an officer or employee of the United States, to wit Deportation Officers of ICE, by departing the gate area without authorization of the officers | 1. on March 27, 2018, within the EDNY<br><br>2. has an outstanding removal order, to wit 9/16/15 by an immigration judge<br><br>3. took any action designed to and for the purpose of preventing and hampering his departure, to wit: did knowingly and intentionally escape, by departing the gate area without authorization<br><br>4. And was removable by reason of being deportable under 8 USC 1227(a) (conviction for a firearms possession offense in Michigan) |

The Government claims two areas of non-cocentricity of elements. First, it argues, 18 USC 751(c) requires a showing of "custody" while 8 USC 1253(c) does not. ECF 21, p. 9, but does not

explain how the element "escape from custody" can be distinguished from the element "action for the purpose of preventing and hampering departure" given the "to wits" involved. Having specified in its complaint underlying Mbacke I that the "hampering action" complained of in Mbacke II is precisely the "escape from custody" complained of in Mbacke I, this claim must fail.

The Government's second argument urging non-concentricity is a reversal from its Mbacke I position: it now claims that the "expulsion" element of 18 USC 751(c) is different from the "removal" element of 8 USC 1253(c). ECF 21, p. 10 ("Section 751 does not require the government to prove that . . . a final order of removal was outstanding.") This distinction between "expulsion" and "removal" was the basis for Judge Bulsara's Judgment of Acquittal. The Government urged conflation of the two terms up to the bitter end of Mbacke I, offering an erroneous jury instruction to that effect, a move that most assuredly got the jury verdict overturned.

The question becomes, then, how do we meaningfully apply Blockburger in the case where the prosecution charges legal/factual Theory B under Charge A, and upon losing Charge A for that very reason, recharges legal/factual Theory B under Charge B, which is what it should have done in the first place.

This required us to seek guidance in Supreme Court cases we cited, like Ashe, Yeager, and Evans. ECF 16, at. 21-22. None of those cases would have gone the defendant's way under the Government's self-serving reading of Blockburger. These cases (all post 1932) provide a basis for a Double Jeopardy bar to subsequent prosecutions for offenses related to previous acquittals or hung juries. The first, Ashe v. Swenson, 397 U.S. 436 (1970) found a double jeopardy bar against separate prosecutions for robberies of two separate poker players at the same robbery scene. Likewise, Yeager, 557 U.S. 110 (2009), found a double jeopardy retrials after a hung jury on

insider trading and money laundering charges – because the fraud charge was related. And in Evans, 568 US 313 (2013), double jeopardy barred a state from reprosecuting a defendant even though the jury charge incorrectly led to an acquittal.

The legal theory of Double Jeopardy having been established, the Government does not dispute the clear prejudice of this successive prosecution as articulated by Mr. Mbacke in his Affidavit. ECF 20, ¶¶. 48-52. Here, where the charges resulted in contrafactual press releases describing Mr. Mbacke as violent and threatening, his reputation and that of his family was so unfairly besmirched that his family had to move out of their then-home and his children sent to distant schools. Id.

**B. DOUBLE JEOPARDY – COUNT II**

The Government does not address the argument, ECF 16, p. 23, that Count II is an impermissible effort at successive or multiple punishments as well as successive charges for the same offense in that Mr. Mbacke's civil detention by ICE was "punitive in either purpose or effect." Ohio v. Johnson, 467 U.S. 493, 498 (1984). Nor does the Government does not and cannot dispute the facts contained in Mr. Mbacke's Affirmation, ECF 19.1, paras. 6-8, describing his conditions of confinement as a civil ICE detainee in a criminal jail, the Calhoun County Jail. There, civil detainees are the minority among violent criminal offenders, and their treatment just as punitive, if not worse, than for criminal detainees. Id.

**C. PLEA JEOPARDY: *FRYE/LAFLER* CLAIM and PROSECUTORIAL VINDICTIVENESS**

The Government does not address the argument, ECF 16, pp. 23-25, that this subsequent prosecution violates Missouri v. Frye, 566 U.S. 134 (2012) and Lafler v. Cooper, 566 U.S. 156 (2012). Nor does it contest Mr. Mbacke's Affirmation, in which he explains that "[h]ad I known

that if I won my misdemeanor escape trial I would still be here in jail and facing two more charges including a felony I would have taken the guilty plea to the charge [and] gotten it over with" seven months ago. ECF 20, para. 47.

We interpret the Government's silence as noble concession. Where, as here, it previously maintained that the Defendant had only misdemeanor exposure, it would be unfair to up the ante after an acquittal.

The Court is mindful, of course, that the law relating to vindictive prosecution could support a dismissal here, even without resort to Frye/Lafler. Vindictive prosecution, however, unlike Frye/Lafler, requires a finding of vindictiveness that the Court need not reach. For example, in Blackledge v. Perry, 417 U.S. 21 (1974), it was presumptively vindictive for the prosecution to file felony charges for the same underlying conduct for which the defendant had exercised his right to a de novo misdemeanor trial. This is not to question the principle that prosecutors may legitimately threaten to bring harsher charges in order to induce a defendant into pleading guilty, despite the fact that the bringing of harsher charges might appear to penalize a defendant for exercising his right to trial. Bordenkicher v. Hayes, 434 U.S. 357 (1978).

But this is not what happened here, as harsher charges were never threatened. Mr. Mbacke's case is procedurally on all fours with the Sixth Circuit case of United States v. LaDeau, 734 F.3d 561 (6th Cir. 2013). There, the Court held that where an adverse ruling forces the prosecution to "do over what it thought it had already done correctly or where duplicative expenditures of prosecutorial resources are required," prosecutorial vindictiveness can be presumed. See,e.g., United States v. LaDeau, 734 F.3d 561, 567-70 (6th Cir. 2013) (internal citations and quotations omitted). In LaDeau, the defendant had been initially charged with possession of child pornography–a charge with no mandatory minimum–but succeeded in

suppressing crucial evidence that dealt a mortal blow to the government's case. The government then prosecuted him for conspiracy to receive child pornography, a charge carrying a mandatory minimum term. The Sixth Circuit upheld the district court's dismissal of the receipt indictment "on the theory that the government's decision to change to a receipt theory warranted a presumption of prosecutorial vindictiveness inasmuch as there was a realistic likelihood that LaDeau was being charged with a more serious offense in retaliation for his successful suppression motion." Id. at 564.

It is our position that this Court need not reach the issue of vindictive prosecution, but if it chose to do so the Court should follow the sound reasoning of LaDeau. In this regard, the improper vindictive motive must be fairly presumed from the conflict of the Government's initial charge under 18 USC 751(a) where Attorney General Sessions Memorandum for All Federal Prosecutors, dated March 10, 2017 (attached to Defense Motion as Exhibit F) sets forth a "simple but important" charging directive that prosecutors "charge and pursue the most serious, readily provable offense." Id.

We now turn to the immigration law related issues.

**POINT IA OF DEFENDANT'S MOTION: THE MBACKE II INDICTMENT MUST BE DISMISSED UNDER PEREIRA**

***The Government's Strained Reading of Pereira v. Sessions***

Opposing Mr. Mbacke's opening brief, Point I.A as set forth in ECF 16, at 8-10, the Government seeks to distinguish Pereira v. Sessions, 138 S. Ct. 2105 (2018), as limited only to the "narrow question" of whether a putative "Notice to Appear" ("NTA") that fails to designate the specific time or place of the noncitizen's removal proceedings can trigger the "stop-time" bar. (ECF 21, at 18 (quoting In re Galdino Castillo Montes, unpublished BIA decision, at 4). This reading ignores Pereira's holding that a putative NTA lacking date and place information is "a notice to appear under [8 U.S.C.] § 1229(a)(1)" as a "three-wheeled Chevy is still a car." Pereira, at 138 S.Ct at 2113, 2127. The omission of time-and-place information is not "some trivial, ministerial defect, akin to an unsigned notice of appeal," id. at 2116, and if it is a nullity in the context of the minor relief sought in Pereira, neither can it be tolerated as an element of a separate criminal prosecution.

To begin with, the definitional section the Pereira Court considered, § 1229(a)(1), does not define "notice to appear" only for that one limited purposes. To the contrary, § 1229(a)(1) is the general definition for purposes of all removal proceedings described in sections 1229 and 1229a.[1] Because § 1229 requires service of the NTA on the noncitizen respondent but does not mention filing with the immigration court, the Government argues that the statute is irrelevant to the immigration court's jurisdiction and that the only requirements for jurisdiction to vest with the court are those spelled out by a pair of regulations, 8 C.F.R. § 1003.14(a) (specifying that the

[1] The Board of Immigration Appeals has also addressed the scope of *Pereira* in a published opinion the government does not cite: *Matter of Bermudez-Cota*, 27 I&N Dec. 441 (BIA Aug. 31, 2018). Because unpublished BIA decisions carry no precedential value, this brief addresses the Board's views as set forth in *Bermudez-Cota*.

immigration court's jurisdiction vests upon filing of a "charging document"); and 1003.13 (defining "charging document" to include a "Notice to Appear"). (ECF 21, at 19). It then asserts that because these regulations do not explicitly cross-reference the statutory definition at 8 U.S.C. § 1229, only the requirements of a further regulation, 8 C.F.R. § 1003.15(b), need be met by the "Notice to Appear" that is filed with the immigration court in order for jurisdiction to vest. This regulation does not require that the NTA specify a time for a hearing, only a place where the government intends to file. Id.

In other words, the Government argues that section 1229 of the Immigration and Nationality Act ("INA), which is captioned "Initiation of Removal Proceedings," defines one sort of "Notice to Appear"—a document that must be served on the noncitizen and which serves to trigger the "stop-time" rule for relief applied for in the midst of proceedings—while the regulations define another sort, an NTA valid for purposes of vesting jurisdiction with the immigration court. And it maintains that the Supreme Court's holding regarding a statutory NTA in Pereira is irrelevant to the question of whether the regulations' definition of an NTA as a document that may lack time-and-place information is ultra vires of the statute, at least for purposes of the use of NTAs to commence removal proceedings.

The Government's attempt to split hairs in this way is unavailing. First, Pereira does not support the extremely narrow reading the government proposes. Pereira held that § 1229(a) uses "quintessential definitional language," and that "when the term 'notice to appear' is used elsewhere in the statutory section, including as the trigger for the stop-time rule, it carries with it the substantive time-and-place criteria required by § 1229(a)." Id. at 2116 (emphasis added). Because § 1229 is the sole provision in the INA that defines the term "notice to appear," it does so for all purposes in the INA. Pereira also forecloses the argument that § 1229 defines only the notice that

must be provided to the alien, by reasoning that an NTA serves an equally essential function as the charging document:

> Furthermore, there is no reason why a notice to appear should have only one essential function. Even if a notice to appear functions as a "charging document," that is not mutually exclusive with the conclusion that a notice to appear serves another equally integral function: telling a noncitizen when and where to appear.

Pereira, 138 S. Ct. at 2115 n.7.[2]

Second, neither the INA nor its regulations support the notion that a valid NTA is one thing under the statute and another under the regulations, such that a "Pereira-deficient" NTA could be saved by 8 C.F.R. § 1003.14(a). Notably, the statutory section the Court held was to be interpreted in pari materia with the § 1229(a)'s definition of "NTA," i.e. the stop-time rule at § 1229b(d)(1)(A), follows several sections later and concerns substantive requirements for relief from removal. But the immediate neighbors of § 1229(a) in § 1229 itself concern matters that are entirely consistent with a congressional purpose to define when the immigration court may take up the issue of removability. See, e.g., 8 U.S.C. § 1229(b)(1) (restricting when an immigration court may schedule "the first hearing date in proceedings under section 1229a"), 1229(d) (mandate to

---

[2] In *United States v. Pedroza-Rocha*, No. EP-18-CR-1286-DB (W.D. Tex. Sep. 21, 2018), (attached as Exhibit I), the district court similarly found that *Pereira*'s reasoning about § 1229(a) could not be cabined to its effect on the stop-time provision, § 1229b(d)(1)(A). In response to *United States v. Veloz-Alonza*, No.1:18CR202, 2018 U.S. Dist. LEXIS 104024 (N.D. Ohio June 21, 2018), a case the Government cites (ECF 21, at 20), the *Pedroza-Rocha* court noted correctly that the *Veloz-Alonzo* court had misread the *Pereira* Court's recitation of its holding. Focusing on the sentence "A putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a notice to appear under section 1229(a) and so does not trigger the stop-time rule," *Pereira*, 138 S. Ct. at 2113-14, *Veloz-Alonza* (like the Government here) reads the "and so" phrase as somehow limiting the meaning of what comes before; but the *Pedroza-Rocha* court correctly "reads that independent clause, 'and so does not trigger the stop-time rule,' as a separate point that does not limit the first independent clause of the sentence . . ." *Pedroza-Rocha*, slip op. at 8.

expeditiously "begin any removal proceeding"). Indeed the section in which § 1229(a) defines the term "NTA" is captioned "Initiation of Removal Proceedings." See Mary Jo C. v. New York State & Local Ret. Sys., 707 F.3d 144, 169 (2d Cir. 2013) ("[T]he title of a statute and the heading[s] of [its] section[s]' are 'tools available for the resolution of a doubt' about the meaning of a statute.") (internal quotations and citations omitted). To suggest that § 1229(a)'s definition of an NTA's requirements bears no relation to the commencement of a proceeding strains credulity.

Meanwhile, the regulation that provides that jurisdiction vests with the immigration court when a charging document is filed, 8 C.F.R. § 1003.14 ("Jurisdiction and commencement of proceedings," is based on the text of § 1229: Part 1003 of Chapter V, Subch. A of 8 C.F.R., defining the powers and procedures of the immigration court system as a whole, cites 8 U.S.C. § 1229 ("Initiation of Removal Proceedings") along with other sections as authority for its promulgation. Accord 8 C.F.R. § 1239.1 (citing § 1229 as authority for the rule that removal proceedings commence by the filing of a notice to appear and shall be served on respondents). The disjunction the Government tries to suggest is a chimera. The "plain text of" § 1229 defines substantive requirements for an NTA, Pereira, 138 S. Ct. at 2113, and the NTA, as all the Justices in Pereira agreed, is the "charging document." 8 C.F.R. § 1003.13; Pereira, 138 S. Ct. at 2115 n.7; id. at 2128 (Alito, J., dissenting). "Based on the plain text of the statute," that document requires a hearing date. Pereira, 138 S. Ct. at 2113, 2116.

The Government nonetheless points to 8 C.F.R. § 1003.15(b), which requires only notice of the court where DHS will file a putative NTA. (Gov't Br. 19). Similarly, the BIA has ruled it is bound to follow the regulations at 8 C.F.R. §§ 1003.15 and 1003.18, which allow a "notice to appear" to be filed with the immigration court without a hearing date if specifying a date is not "practicable." Matter of Bermudez-Cota, 27 I. & N. Dec. 441 (BIA 2018). Pereira specifically

addressed—and invalidated—8 C.F.R. § 1003.18(b). Pereira explained that "notices to appear" were historically issued without hearing dates pursuant to 62 Fed.Reg. 10332 (1997), which is codified at 8 C.F.R. § 1003.18(b), but the Supreme Court proceeded to hold that this regulation contradicts the unambiguous language of § 1229(a)(1). Pereira, 138 S. Ct. at 2111, 2113-14 (concluding that "notice to appear that fails to designate the [hearing date] is not a 'notice to appear under section 1229(a)'"). Thus, the Supreme Court has already held that 8 C.F.R. § 1003.18(b)'s discussion of requirements for an NTA, and by extension 8 C.F.R. § 1003.15(b)'s, deviate from the sole statutory definition of a "notice to appear" in the INA, and Pereira does not countenance the bifurcated scheme the Government urges here.

The Government's view of bifurcated NTA functions and requirements also creates a glaring anomaly. If an incomplete NTA without a hearing date were sufficient to commence removal proceedings after Pereira, the stop-time rule at issue in Pereira would never apply, as there would be no "time" to "stop." Pereira was crystal clear that "to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." Pereira, 138 S. Ct. at 2114 (quoting 8 U.S.C. § 1229(a)(1)(G)(i)). The Government's interpretation would improperly nullify the INA's stop-time provision, which Congress could not have intended.

Pereira could scarcely be clearer that it reached its result based on the statute's plain and unambiguous language. 138 S. Ct. at 2113 (discussing "plain text of statute"). "Chevron deference" to the BIA's defense of regulations rendered ultra vires of that language (i.e., 8 C.F.R. §§ 1003.15; 1003.18(b)) is unwarranted given the lack of any statutory ambiguity. Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 468 U.S. 837 (1984). But even if the statute were deemed ambiguous, which it is not, in this criminal case the statute must be

interpreted in light of the rule of lenity, not that of "Chevron deference." The rule of lenity prevents courts or anyone other than Congress from exercising Congress's power to define criminal conduct. Allowing Chevron deference in a criminal case or in interpreting a statute with criminal ramifications would allow the Executive to either "define criminal activity," to influence what is criminal, or to expand the reach of a criminal statute, which only Congress may do. See United States v. Bass, 404 U.S. 336, 348 (1971). In light of United States v. Mendoza-Lopez, 481 U.S. 828 (1987), discussed further infra, in a criminal case in which the validity of a prior administrative order of removal is an element, the court must satisfy itself that the prior order, if never previously judicially reviewed, comported with due process. To apply Chevron deference would have the perverse effect of subtly shielding from independent judicial scrutiny the Executive's interpretation of the very criminal laws that it sets out to prosecute. See also Pereira, 138 S. Ct. at 2120-21 (Kennedy, J., concurring) (arguing that constitutional separation-of-powers principles require that deference not be given to "an agency's interpretation of the statutory provisions that concern the scope of its own authority" or "jurisdiction").

The Due Process problem identified in Mr. Mbacke's Motion therefore exists, and is severe. The Supreme Court has long held, and has recently reaffirmed, that Fifth Amendment due process protections apply at least as vigorously in the immigration context as they do in the criminal. Rejecting a government argument that a deportation statute should be reviewed under a less rigorous "void for vagueness" standard than a criminal one, the Court this year found the argument "foreclosed" by its caselaw applying like standards "in view of the grave nature of deportation—a drastic measure, often amounting to lifelong banishment or exile . . . ." Sessions v. Dimaya, 138 S. Ct. 1204, 1213 (2018) (internal quotation marks and citations omitted). Cf. Lee v. United States, 137 S. Ct. 1958, 1968 (2017) ("Deportation is always a particularly severe penalty,

and we have recognized that preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence" (internal quotation marks and citations omitted)).

Lack of jurisdiction in the tribunal that rendered the removal order on which this case is based manifestly creates its own per se prejudice---suffering criminal sanction for alleged resistance to the carrying out of a removal order that was a nullity.[3] Here the dateless NTA represented a particularly harmful Due Process violation within the context of the putative removal proceeding itself. As Mr. Mbacke explains under oath, he found the conditions of immigration detention difficult to endure and worried, when presented with an NTA with no hearing date, that it meant proceedings in immigration court would mean delay with no end in sight (ECF 20-1), at ¶¶ 5-8, 9). This was reinforced when a deportation officer visited him in ICE custody and warned him that declining to stipulate to removal would mean a long (and, she averred, pointless) wait for the immigration judge; these considerations caused him to accept the stipulated removal he had initially declined. Id. ¶¶ 9, 11. To his surprise, he was brought to a video hook up with an immigration judge anyway. This unannounced video proceeding capitalized on his fear that an appearance before an immigration judge would only cause protracted and pointless delay, a fear planted by the "sine die" hearing notice he originally received and confirmed by the deportation agent.

The transcript of the removal hearing makes this clear (the Government's draft is attached

---

[3] The Government does not dispute the fact that Mr. Mbacke was brought, without notice, before an immigration judge by video hook up on September 16, 2015. ECF 20.1, Mbacke Affidavit, ¶¶ 14-16. Putting aside the coercive nature of this video hook up, and Mr. Mbacke's reasonable belief that an immigration judge could only cause further delay in his inevitable removal, *Id.* at 14, the fact that he was brought to that video hook up in no way cures the prejudice. 8 C.F.R. § 1003.14(a) goes to subject matter jurisdiction, which is not waived by appearance or participation in the void proceeding. *See Pedroz-Rocha,* slip op. at 9 (citing *Shogunle v. Holder*, 336 F. App'x 322, 323 (4th Cir. 2009)).

as Exhibit H). Based on the deportation officer's advise that seeing a judge would mean protracted detention for no purpose, Mr. Mbacke did not want to see an immigration judge, but when pulled up to the video room was told by guards that he could be forced to. (Def. Decl. ¶ 14). His fear that he was being placed on a path of pointless delay was also manifest in the hearing audio: his first substantive remark was to alert the judge that "I asked the officer to give me. . . [U/I] sign the stipulation from removal." (Exhibit G, Tr. 3:36-37). The judge's admonition that he remain calm obviously refers to his belief that an appearance before an immigration judge would not benefit him but rather trap him even longer in a pointless bureaucratic delay. (Exhibit G, Tr. 4:45, 9-10 ("IJ: OK sir that's why it is very important that you try to stay calm because . . . . We can accomplish what it is that you want in this particular instance ok.")

In combination, the sine die NTA and the deportation officer's coercive message that an appearance before an immigration judge was a bad thing, delivered a one-two punch to Mr. Mbacke, priming him for the IJ's rush to remove him without proper consideration of his relief eligibility, as set forth in further detail infra.

**POINT I.B OF DEFENDANT'S MOTION: THE INDICTMENT MUST BE DISMISSED BECAUSE THE PREDICATE IS NOT A CATEGORICAL MATCH FOR FEDERAL FIREARM STATUTE**

In its opposition, the Government does not address, and must be deemed to concede Mr. Mbacke's argument that Moncrieffe v. Holder, 569 U.S. 184 (2013) and its progeny, including United States v. Townsend, 897 F.3d 66, 72 (2d Cir. 2018), prevents the use of a non-violent Michigan firearm possession conviction to render him removable pursuant to 8 U.S.C. § 1227(a)(2)(C). This is so because where a state statute sweeps more broadly than its federal counterpart, this removal ground does not apply. (Def. Mot., ECF 16, Point I.B, at 10-12).

As discussed further infra, this apparent concession dooms the Government's argument

that the Court lacks jurisdiction over Point II of Mr. Mbacke's Motion (the collateral attack and Mendoza-Lopez issues) by dint of the jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(C), which would do its jurisdiction-stripping only if Mr. Mbacke were actually removable under 8 U.S.C. § 1227(a)(2)(C), which he was not. 8 U.S.C. § 1252(a)(2)(C) ("no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of . . . section . . . 1227(a)(2)(C)"). If the firearm removal provision does not apply, which it does not pursuant to, neither does the purported jurisdictional bar. (As explained infra, the Government is further mistaken that § 1252(a)(2)(C) operates to deprive a criminal defendant of collateral review of his removal order under 8 U.S.C. § 1252(b)(7)).

**POINT I.C OF DEFENDANT'S MOTION: COUNT II MUST BE DISMISSED AS A MATTER OF DUE PROCESS**

The Government also does not address the argument to Dismiss Count II, ECF 16, Point I.C, at 12, that it is violative of Due Process to charge Mr. Mbacke in Count II with willfully failing to comply with regulations and requirements issued pursuant to 8 U.S.C. § 1231(a)(3), "to wit, . . . fail[ing] to obey reasonable written restrictions on the defendant's conduct and activities that were prescribed . . . pursuant to an order of supervision." Indictment (ECF 7). To the extent the Government's Count II theory is that Mr. Mbacke's refused to obtain travel documents from the Senegalese consulate, it proved the opposite at the trial in Mbacke I, see Def. Mtn, ECF 16, at 23 n. 10, 26 (showing how A-file custodian testified that nothing in the immigration records indicates that Mr. Mbacke failed to cooperate with the effort to obtain his travel documents from the Senegalese consulate). Due Process precludes such a theory of liability as set forth in Point I.C. of Mr. Mbacke's Motion. See United States v. Park, 421 U.S. 658, 673 (1975) (criminal liability cannot apply where defendant "was powerless to prevent or correct the violation").

**POINT II OF DEFENDANT'S MOTION: COLLATERAL ATTACK AGAINST COUNTS I AND II**

The Government argues (ECF 20, at 11-13) that 8 U.S.C. § 1252(a)(2)(C) deprives this Court of jurisdiction to decide the validity of the underlying removal order that forms an element of the charged offense before it, jurisdiction expressly provided in 8 U.S.C. § 1252(b)(7)(A). The Government alleges that this much of Mr. Mbacke's Motion is barred because he falls within one of the classes of removable aliens covered by the jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(C). However, as just discussed above, Mr. Mbacke was not in fact in that class as he is not removable under § 1227(a)(2)(C). Thus even assuming arguendo that § 1252(a)(2)(C) applies to his Motion, which it does not, for reasons explained in detail below, this Court has jurisdiction.

When the substance of a noncitizen's challenge to a removal order is that a given conviction is not properly classified as a removable one under the criminal grounds specified at § 1252(a)(2)(C), it is firmly established that the court has jurisdiction to determine whether § 1252(a)(2)(C) applies, and that "the jurisdictional issue merges with the merits." Collymore v. Lynch, 828 F.3d 139, 142 (2d Cir. 2016) (internal quotation and citation omitted); see also Morris v. Holder, 676 F.3d 309, 313-14 (2d Cir. 2012). Because his conviction does not fall under § 1227(a)(2)(C), as set forth supra and as the Government appears to concede in its Brief in Opposition, the Court can adjudicate the entirety of the Motion.

In any event, even if the Court were to determine that Mr. Mbacke was properly deemed removable under 8 U.S.C. § 1227(a)(2)(C), there is no bar to considering his motion brought under 8 U.S.C. § 1252(b)(7) to challenge the validity of the order of removal on which this prosecution rests. The Government's argument that the bar at § 1252()(2)(C) applies relies on United States v. Dohou, No. 3:16-cr-65, 2018 WL 4186403 (M.D. Pa. Aug. 31, 2018), a decision

that determined sua sponte, without the benefit of adversary briefing, that § 1252(a)(2)(C) completely barred consideration of the defendant's § 1252(b)(7) motion. ECF 20, at 12-13. Dohou is an outlier and is wrongly decided. Indeed it endorses an argument the government had withdrawn as concededly incorrect in an earlier Third Circuit case..

Section § 1252(a)(2)(C) limits federal court review of final orders of removal against noncitizens who are removable on specified criminal removal grounds "except as provided in subparagraph [1252(a)(2)(D)]," which allows review of constitutional and legal issues even in such cases. Enacted as part of the sweeping 1996 overhaul of immigration law, its purpose was to limit more permissive prior judicial review provisions and channel court challenges to removal orders through the courts of appeals (where previously district courts had overlapping jurisdiction to review agency decisions under § 2241 for noncitizens in custody). Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA)," Pub.L. 104-208, Div. C, Title III, §§306(a), Sept. 30, 1996, 110 Stat. 3009-612; see generally, e.g., INS v. St. Cyr, 533 U.S. 289, 305-311 (2001) (reviewing history of judicial review pre-and post-IIRIRA and discussing effect, inter alia, of § 1252(a)(2)(C)). Despite this channeling intent, courts have interpreted it quite narrowly to avoid constitutional concerns. See, e.g., St. Cyr, 312-13 (holding that § 1252(a)(2)(C) did not preclude habeas review of certain claims brought by designated criminal aliens under pre-REAL ID statute). Importantly, courts have found that it does not extend to judicial review of matters intrinsically related to the existence of a removal order against a designated criminal alien, such as immigration detention. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 688 (2001); Demore v. Kim, 538 U.S. 510, 516 (2003) (determining that Court has jurisdiction to review detention of noncitizens removable for many grounds subject to § 1252(a)(2)(C)).

Section 1252(a)(2)(C) was not intended to (nor could it, constitutionally) limit a district

court's ability to consider, in the context of a criminal prosecution, whether a prior deportation order that was never previously judicially reviewed was unlawful, such that reliance on it to impose criminal sanctions would itself be unjust. In United States v. Mendoza Lopez, 481 U.S. 828, 838 (1987), the Supreme Court held that where fundamental procedural defects in a deportation proceeding rendered direct review of the deportation unavailable to the defendant, due process required that review be made available in "any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense." The case concerned 8 U.S.C. § 1326, the illegal re-entry statute, but nothing in its reasoning limits its holding to that statute. Instead, the Court proceeded from a general concern that "the use of the result of an administrative proceeding to establish an element of a criminal offense is troubling" and applied a general rule that "[p]ersons charged with crime are entitled to have the factual and legal determinations upon which convictions are based subjected to the scrutiny of an impartial judicial officer." Id. at 838 n.15, 841.

Mendoza-Lopez found that Congress did not intend to allow such judicial scrutiny under § 1326 but held that it was nonetheless constitutionally required. Id. at 837-38. Congress later amended § 1326(d) to render the statute constitutional by providing for collateral review of a prior deportation in the context of the criminal prosecution. See 8 U.S.C. § 1326(d); United States v. Gomez-Hernandez, 777 F. Supp. 2d 464, 468 (E.D.N.Y. 2011). When Congress created the 8 U.S.C. § 1253 offense at issue here in 1996, it also enacted § 1252(b)(7), similarly providing for collateral review (though in broader terms, specifying no agency exhaustion requirement and in fact precluding exhaustion during the prosecution). Pub.L. 104-208, Div. C, Title III, §§306(a), 307(a), Sept. 30, 1996, 110 Stat. 3009-612. The Government has expressly conceded before the Third Circuit that § 1252(b)(7) was meant to prevent the same constitutional infirmity that plagued

§ 1326 before section 1326(d) was added, disavowing the argument the government now makes to this Court: "There is no exception to the rule announced in Mendoza-Lopez for deportations by reason of the commission of certain classes of offenses such as firearms offenses. It would appear that 8 U.S.C. § 1252(b)(7), granting limited review of removal orders in criminal cases brought under section 1253(a), was included in [IIRIRA] in order to prevent that Act's being found unconstitutional under Mendoza-Lopez." Id. Br. of United States, United States v. Ayeni, No. 00-cr-3350, 2000 WL 33994025, at 1 n.1 (3d Cir. submitted June 23, 2000). This concession is unsurprising, given how broadly Mendoza Lopez stated its own holding: "[w]e hold[] that, at a minimum, the result of an administrative proceeding may not be used as a conclusive element of a criminal offense where the judicial review that legitimated such a practice in the first instance has effectively been denied." Id. at 838 n.15.[4]

Numerous circuit and district courts have, therefore, correctly entertained § 1257(b)(7)

---

[4] The Dohou Court does not evince awareness of, let alone grapple with, the constitutional problem posed by its holding that § 1252(b)(7)(A) and 1252(a)(2)(C) jointly permit a defendant to be convicted under § 1253 on the basis of an unlawful removal proceeding so long as the defendant was criminally removable. It quotes, out of context, Mendoza Lopez's footnoted statement that "'the collateral challenge we recognize today is available only in criminal proceedings instituted after [illegal] re-entry'" as though that limited its holding to that one crime. Dohou, 2018 WL 4186403, at *4 (quoting Mendoza-Lopez, 481 U.S. at 839 n.17) (italics and alteration in Dohou)). But that "parenthetical[]" statement in a footnote was addressed to the notion that the court's holding created some additional tool for a noncitizen to forestall deportation. See id. The case simply does not support such a narrow reading: it found that "[o]ur cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." Id. at 837-38. The cases that "establish[ed]" this related to criminal penalties for (and agency proceedings related to) refusing induction to the army and violation of wartime food price controls. Id. at 838 (citing Estep v. United States, 327 U.S. 114, 121–122 (1946); Yakus v. United States, 321 U.S. 414, 444 (1944); McKart v. United States, 395 U.S. 185, 196–197 (1969)). Moreover, the Mendoza-Lopez Court authored that footnote in 1987, nine years before the offense codified at § 1253 and charged in this case was created, so its failure to mention § 1253 is meaningless.

motions brought by defendants who were removable on criminal grounds covered by § 1252(a)(2)(C). See, e.g., United States v. Yan Naing, 820 F.3d 1006, 1019 (8th Cir. 2016) (defendant ordered removed for aggravated felony under 8 U.S.C. § 1227(a)(2)(A)(iii)); United States v. Kabore, No. 13-cr-217 (N.D. Ga. June 19, 2014) (defendant convicted of crime involving moral turpitude); United States v. Miszczuk, 847 F. Supp. 2d 227 (D. Mass. 2012) (defendant removable for aggravated felony and multiple crimes involving moral turpitude). Cf. United States v. Contant, 679 F. App'x 95 (Feb. 9, 2017) (denying relief from § 1253 conviction for defendant removable for drug offense under a writ of error coram nobis because, inter alia, he could have brought a § 1252(b)(7) motion during that prosecution). One such case, United States v. Ayeni, 66 F. Supp. 2d 617 (M.D. Pa.), aff'd, 254 F.3d 1079 (3d Cir. 2001), expressly considered and rejected the argument that § 1252(a)(2)(C) barred the motion, denying it on other grounds; it was in this case that the government later disavowed the jurisdictional argument on appeal as noted above. In contrast, Dohou cites only one case in support of its holding, United States v. Owusu, No. 3:15-cr-285, 2018 WL 3417218 (M.D. Pa. Jul. 13, 2018), another Middle District of Pennsylvania decided a few weeks prior. Owusu simply declares, in three sentences devoid of any reasoning or supporting authority, that § 1252(a)(2)(C) bars a motion under § 1252(b)(7).[5]

[5]Ayeni has the far stronger argument. Strangely, Dohou also seeks to contrast § 1326 from § 1253 because the former expressly provides for collateral review of the removal order (in subsection (d)) while, it avers, "Section 1253 does not contemplate any possibility for such collateral attacks." Dohou, 2018 WL 4186403, at *4. The court finds that § 1252(a)(2)(C) "unequivocally prohibits" judicial review of designated removal orders and "does not state that notwithstanding its broad prohibition . . . collateral attacks may be permitted," whereas section 1326 "expressly contemplate[s]" the possibility . . . ." Id. This merely layers dubious reasoning upon false premises. Congress did "contemplate" review of underlying deportation orders in § 1253 prosecutions, in § 1252(b)(7)(A). Why the inclusion of this provision in § 1252 rather than § 1253 should matter is not explained. The further conclusion that § 1252(a)(2)(C)'s failure to exempt collateral attacks to removal orders in § 1253 prosecutions trumps § 1252(b)(7)'s provision for such attacks appears to be tacitly based on the novel rule of construction that the general controls the specific. But even

There are other ways the Government's argument appears to prove far too much. If § 1252(a)(2)(C) applies as a restriction on the availability of a motion under § 1252(b)(7), it not is not clear why § 1252's numerous other restrictions on direct review of removal orders should not equally apply (or, again, why they should not equally apply to § 1326(d)). For example, § 1252(a)(5) specifies that "notwithstanding any other provision of law," a petition for review in the court of appeals is the "sole and exclusive means" for judicial review of an order of removal," except as provided in § 1252(e) (governing expedited removal orders under 8 U.S.C. § 1225(b)). This would appear, on the Government's logic, to vitiate both § 1252(b)(7) as to non-criminal aliens and § 1326(d) as to all defendants, since both contemplate motions in the district court. In the same vein § 1252(b) requires any such challenge be brought within thirty days of the order of removal being challenged and specifies briefing deadlines and other matters. But the government has never, in undersigned counsel's experience, opposed § 1326(d) motions on these grounds or sought to transfer them to the courts of appeals.

**POINT II OF DEFENDANT'S MOTION: COLLATERAL CHALLENGE TO INDICTMENT – Defective Stipulated Removal Process and Relief Eligibility Notice.**

As noted above, when Mr. Mbacke was held in ICE custody in August of 2015, he was uncounseled and presented by an ICE agent with a form for stipulated removal. ECF 20, Mbacke Aff. ¶ 9. He first would not sign the form and tried unsuccessfully seeking legal assistance from the limited list of providers he was given. Mr. Mbacke's memory on this is corroborated by Bates 428

---

that strange principle is not consistently applied: if the Dohou court were correct that § 1252(a)(2)(C)'s failure to specify exceptions for criminal cases renders § 1252(b)(7) meaningless as to noncitizens described in § 1252(a)(2)(C), it is difficult to see why the same should not be true of § 1326(d) given § 1252(a)(2)(C)'s "notwithstanding any other provision of law" language. Dohou draws the opposite conclusion, finding the mention of such attacks in § 1326(d) meaningful, but offers no reason to do so in light of its view of the breadth of § 1252(a)(2)(C).

(attached as Exhibit J), which shows that he was provided a list of "legal providers" that included one for Arab non-citizens, two lawyers who specified that they would not represent incarcerated "criminal aliens," one lawyer in Quebec, Canada, that could not be called from the jail, and one law school clinic that was not in session at the time of Mr. Mbacke's Stipulated Removal. Bates 428.

Left without a lawyer, and based on the one-two punch of the "sine die" NTA and the deportation officer's incorrect assessment of his removability, Mr. Mbacke signed the deportation officer's Stipulated Removal form, which the officer had already prepared in typewritten form. Id. ¶¶ 10-12. The Government does not dispute that Mr. Mbacke signed the stipulation on the deportation officer's advice that he was "smart to do it because now [he] won't see the judge," or that Mr. Mbacke had any understanding of the rights he was giving up. Mbacke Aff. ¶ 12. Denied by virtue of his detention the ability to secure pro bono legal advice, he had no basis to evaluate or doubt the deportation officer's purportedly helpful warning that "you got a felony. There is no purpose of you fighting your case. You got no chance and it will take a long time." Id. ¶ 9.

The benefit he understood he was gaining by stipulating to removal was to forestall (assertedly useless) detention awaiting an immigration judge hearing, id. ¶ 12, but in the event, that is not what happened. Mr. Mbacke was called without notice for a video hook up with an immigration judge on September 16, 2015, some three weeks after he signed the stipulation. Such a hearing is not routinely scheduled when a noncitizen has stipulated to removal, and indeed the judge herself seemed mildly puzzled that the hearing had been calendared: "Ok, sir and you may have [signed the stipulation], but for whatever reason, and sometimes this happens, that they still put you in front of the judge." Exhibit H, attached (3:39-40). In this, as in other areas, the immigration judge was a misleading explanation of the law. See 8 C.F.R. § 1003.25(b)(1)

(permitting immigration judge to enter a removal order "without a hearing and in the absence of the parties" when stipulated to by the noncitizen).

The Government argues that the hearing afforded Mr. Mbacke his right to due process of law and renders irrelevant whether the immigration judge properly assured herself that Mr. Mbacke knowingly and voluntarily agreed to be ordered removed (ECF 21, 14-18). In fact the opposite is true: his video appearance before the judge only served to exacerbate the coercive nature of the earlier meeting with the agent that resulted in the stipulated removal document being signed. The deportation officer had volunteered her opinion, in the guise of advising Mr. Mbacke of what was "smart" for him, that he had "no chance" and "no purpose" for fighting his removal because of his felony weapon conviction. ECF 20, Mbacke Aff. ¶ 9. This is the antithesis of the time-honored principle that a waiver is an "intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

As set forth in Mr. Mbacke's Motion Point I.B—and as the government conspicuously fails to contest—the deportation officer and the immigration judge were simply wrong. Mr. Mbacke's Michigan conviction under Mich. Penal Code § 750.227B-A was categorically broader than the ground of deportability he was charged with. (ECF 16, at at 10-12). The immigration judge simply placed her imprimatur on the erroneous advise of the deportation officer, indicating that Mr. Mbacke's removal was a foregone and inevitable conclusion over which she had no discretion. The immigration judge delivered long and largely irrelevant lectures about local detention practices and nonimmigrant visas, but told Mr. Mbacke nothing about what the government needed to sustain the firearms removability charge, and made no reference to the relevant (and dispositive)

definitional language. (Exhibit H, at 7-8, 13-14, 16:23-27).[6] Finding a pro se noncitizen respondent removable on the basis of a conviction that does not actually trigger removability under the required categorical analysis is fundamentally unfair. See, e.g., United States v. Moncrieffe, 167 F. Supp. 3d 383 (E.D.N.Y. 2016); see also, e.g., United States v. Aguilera-Rios, 769 F.3d 626, 629 (9th Cir. 2014).

Of particular concern was the immigration judge's analysis of Mr. Mbacke's relief eligibility, which further compounded the incorrect information the deportation officer had given him. The judge was on notice from the paperwork and earlier questions that Mr. Mbacke has two children by one partner and one child with another, and that mothers and children all resided in the United States; she also was aware that Mr. Mbacke's mother resided in Switzerland with her husband. (Exhibit H, at 9). After establishing that he had no subjective fear of returning to Senegal so as to rule out asylum or related relief, the judge asked one final question, appearing to nearly forget to do so: "I'm sorry do you have the money to pay your way back to Senegal[?]" (Tr. 17:1-2, 7-8). She repeated the question again when Mr. Mbacke first understood the question as relating to resources he had in Senegal, discouraged any discussion of the matter and this time he answered "no." Id. at 17:10. She thereupon ordered him removed and secured his acceptance of this order as final, only then remarking (apparently to the government), "Will not be eligible for cancellation

[6] The judge also took a tone clearly designed to discourage rather than assist development of the factual record, contrary to the judge's obligation to be a neutral adjudicator and to develop the record. For instance, when Mr. Mbacke tried to explain in response to a question about the location of his passport that he had last given his passport to a family member and had never given it to immigration officers, the judge interrupted him veered into an explanation of how he must have been taken into custody by ICE officers upon release from criminal custody. (Tr. 6:26—7:14). When Mr. Mbacke responded, simply, that county detention officials had effected the transfer, the judge seemed to defend her incorrect assumption by giving an extended exposition of local detention practices, admonishing him "Just listen to me sir I've been doing this for a long time. You listen to me I'll educate you." (Tr. 7:23-25; *see id.* at 7-8). The judge never allowed Mr. Mbacke to explain what had become of his passport, the question that began this colloquy and might have assisted in the obtaining of his travel documents–the reason he was not removed. *Id.*

of removal because of the [237(a)(2)] charge." Id. at 17:21-22. This, of course, merely reiterated her error in finding him removable on that basis in the first instance.

This rapid conclusion to the hearing contained an even more consequential legal error. As explained in Point II.A.2 of Mr. Mbacke's Motion, the judge has an obligation to afford a respondent an opportunity to apply for relief for which he is apparently eligible. See also 8 C.F.R. § 1240.11(a)(2),(b). The Government argues that Mr. Mbacke's "no" answer to the question of whether he had the money to pay his way back to Senegal "alone was enough for the Immigration Judge to determine that the defendant was not eligible for voluntary departure." (Gov't Br. 16). This is simply incorrect, and ignores the caselaw cited in support of Mr Mbacke's Motion. An immigration judge may grant a noncitizen up to 120 days to depart at his or her own expense. 8 U.S.C. § 1229c(a)(1),(2). While voluntary departure requested as a failsafe when other relief has been requested and denied requires that the noncitizen demonstrate the financial means to depart to be found eligible, voluntary departure requested in lieu of other relief has no such requirement. Compare 8 U.S.C. § 1229c(a) with id. § 1229c(b); see also 8 C.F.R. § 1240.26. The noncitizen may request up to 120 days to secure the necessary funds, and the order of voluntary departure simply converts by operation of law to a removal order if s/he is unable if the allotted time is not extended. 8 C.F.R. § 1240.26(d),(f).

Judge Woods recently found in United States v. Guzman, No. 18-cr-216-GHW, 2018 WL 3443158 that a noncitizen was not afforded an opportunity to seek voluntary departure when he answered no to the question whether he had the funds immediately available to pay his passage, holding that the immigration judge erred in that he "did not ask whether [the defendant] could obtain funding for his travel in a reasonable voluntary departure period to be established." Id. at *6. "When a regulation is promulgated to protect a fundamental right derived from the

Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid." Waldron v. INS, 17 F.3d 511, 518 (2d Cir. 1993); see also United States v. Copeland, 376 F.3d 61, 72 (2d Cir. 2004) ((“The issue . . . is not whether Section 212(c) relief is constitutionally mandated, but whether a denial of an established right to be informed of the possibility of such relief can, if prejudicial, be a fundamental procedural error. We believe that it can.”).

As Mr. Mbacke’s video hook up demonstrates, the immigration judge had ample indicia of his eligibility for voluntary departure. He had close U.S. resident family members and a mother who lived in Switzerland, a father who was a former diplomat, who could have helped him financially–his lack of funds at the Calhoun County Jail was hardly the relevant inquiry. Mr. Mbacke could, in fact, have obtained such funds given the chance and had been consistently pressing for that opportunity without ever being educated about the meaning of the actual term “voluntary departure:” “I wanted to go back to Africa with a plan.” (Mbacke Aff.¶ 18). He tried to explain this to the immigration judge (“I don’t want to be homeless in Africa”) but she cut him off and pursued her own agenda, never educating him about what really mattered: his eligibility for voluntary departure.

Judge Woods’ Guzman decision succinctly summarizes the uniform caselaw in this Circuit holding that the denial of an opportunity to apply for voluntary departure is a fundamental procedural flaw that renders the resulting removal order fundamentally unfair. Guzman, 2018 WL 3443158, at *3-*5. For the reasons set forth there and in the cases cited therein, Mr. Mbacke’s removal order was likewise fundamentally unfair within the meaning of 8 U.S.C. § 1252(b)(7) and the Indictment should be dismissed on that basis.

**POINT IV OF DEFENDANT'S MOTION: ILLEGAL SEARCH AND SEIZURE ON OR PRIOR TO MARCH 27, 2018**

The Government misconstrues this point, which was probably inartfully stated in our original Motion, ECF 16, pp. 25-26. Defendant does not seek suppression "based on Judge Bulsara's Order." ECF 21, at p. 22. Judge Bulsara did not need to reach the question posed regarding the illegality of the initial January 30, 2018 seizure. His Judgment of Acquittal was based on issues of statutory interpretation and lack of proof.

The Fourth Amendment injury complained of is the illegal seizure of Mr. Mbacke, which began on January 30, 2018, following his state court acquittal. This "illegal seizure" continued with the ICE agents taking of Mr. Mbacke to the Detroit and JFK Airports on March 27, 2018. It is these Fourth Amendment injuries from which the remedy of exclusion is sought.

Normally we would seek an evidentiary hearing were there factual disputes regarding the basis for the illegal seizure. However, we had a full adversarial trial here so there is no need to reinvent that wheel. The evidence at the trial in Mbacke I is far beyond the preponderance standard for such hearings. It showed that the January 30, 2018 seizure of Mr. Mbacke was based on a "Revocation of Release" form (Government Exhibit 5) that was a legal nullity. That form was issued by an agency (an ICE Field Office) that had been previously divested of jurisdiction to affect Mr. Mbacke's release status, as shown by the Release Order of ICE Headquarters in Washington, D.C. Exhibit D, attached to Defendant's Motion. Even if the ICE Field Office had jurisdiction to affect Mr. Mbacke's previous release (which it did not), only the Field Director, not the arresting officer could sign it – and the evidence at trial showed that the arresting officer signed the Field Director's name, with no proof of authority to do so.

To put this in more familiar territory, if this Revocation Order (Govt Exhibit 5) had been

an Arrest Warrant being offered to justify a street arrest, it would be an Arrest Warrant that was not signed by a judge with authority to find probable cause, but rather by the arresting agent purporting to be the person with authority. If this Arrest Warrant were scrutinized at a suppression hearing, it would be revealed that the person whose name was rubber stamped on the purported Arrest Warrant lacked authority to sign such a warrant in the first place, even if the signature had been properly obtained. This Arrest Warrant would surely be doomed, and all evidence flowing from the unlawful arrest suppressed.

**POINT V: DISMISSING COUNT TWO PURSUANT TO RULE 12(B)(3)(A)(i) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE FOR IMPROPER VENUE AND RULE 12(B)(ii) FOR PREINDICTMENT DELAY.**

The Government appears to concede the lack of venue in the EDNY for Count II, and does not dispute Mr. Mbacke's Affirmation setting forth the prejudice of the preindictment delay should that charge be brought in the distant district. ECF 20, ¶¶ 48-52. Moreover, venue is not the only problem with this charge. It would raise serious constitutional issues were the Government permitted to drag Mr. Mbacke through a seven plus month incarceratory ordeal only to later charge him in the District of Michigan with the crime of failing to secure travel documents from a consulate that the evidence at trial in Mbacke I showed were being withheld by the consulate. This would be a clear example of preindictment delay designed to gain tactical advantage in violation of Due Process. See, e.g., United States v. Marion, 404 U.S. 307, 322 (1971

For the foregoing reasons, the Indictment should be dismissed, or alternative remedies and relief granted.

Respectfully, Submitted,
DAVID E. PATTON, ESQ.
Federal Defender of New York
By:
/s/

Jan A. Rostal, Esq.
Isaac Wheeler, Esq.

enc.
cc: AUSA Jonathan Algor, Esq.
Mr. M. Mbacke (MDC)